The next case is 5-13033, Troske v. Troske, and this time we have Mr. Steiger. Would you proceed, Mr. Steiger? Thank you, Justice Kagan. This is Mr. Blood of the Police Department. This is kind of an offshoot. The good news is we have some things that Mr. Blood and I agree upon. We agree upon the standard of review, and this is on the principal issue that we're dealing with as to whether or not Judge Byers finding Bob in contempt was against the manifest weight of the evidence that constituted an abuse of the trial court's discretion. The other thing that Mr. Blood and I agree upon is the quantum of proof that we had to present to Judge Byers to show that because Bob was claiming he did not have the money, that it was not a willful nonpayment of the full amount of child support, and that's In Re Marriage of Logston, which spells out in some detail how specifically one has to present evidence to the court. As we all know, you can't just come in and say, well, I'm a little short of money, that's why I didn't pay the child support. As you heard briefly, Bob's business was he sold health insurance. He sold private health insurance policies. The period that we're looking at, again, the unusual stipulation to the baseline income in 2009, and then when we have the hearing on contempt, it's 2012. Bob testified, first of all, that with the Affordable Care Act, there was tremendous change in the ability to market health insurance. He also testified that he had lost some of his main customers merely because they had changed, I think it was a corporate combination, so they changed brokers. We looked at the changes in his income. We had his corporate and personal returns from 2009. We had his corporate and personal returns from 2012. They were the first exhibits we had really presented to Judge Byers. The gross income fell from 413 to 243, a significant drop. The net income dropped from 148 to 93. Now, again, in domestic relations, we deal with this all the time. He's self-employed. He's got an issue with paying child support. If he just comes in and says, I'm having a terrible year, my business is down, there's justifiably a certain amount of suspicion. You know, we want to see more proof. The big issue in this case was during the 18 months that this case was pending with Judge Levy, the IRS descended upon Bob and Karen because these were joint returns from 2007, 2008, 2009, their personal income taxes that were not paid. During the pendency of this, they intercepted his commission checks. Empire Health was sending him a check for I believe it was $16,000. The IRS intercepted it. They intercepted another one. They levied on his bank accounts. And these were all – this wasn't Bob's testimony. We had documents of all of this that were all admitted as he sees these. They levied on his personal property. As a result of this, he had to enter into an installment agreement with the IRS. The installment agreement was $30,000 a year. So, again, you have evidence as to the change in his business. You have evidence as to documentation of the changes in his income. We had documents showing the amounts that the IRS had intercepted. We had documents showing that he had entered into this installment payment agreement. We had documents showing he was paying it, that he had to pay it, and he was paying it every month. Let me ask you a question. Sure. I saw that the petition to modify child support was filed less than 30 days after the order was issued. I filed it. And yet the first matter heard before the court was her petition for contempt. I couldn't get it here. We appeared multiple times with Judge Levy. I was the one that entered into the stipulation as to what the arrearages were. We would appear, and we would say, I need a hearing on this. And we were basically told, well, I want you to do this first. Okay. So then we worked out the arrearages. We entered a written stipulation to that effect in order. And I went back and said, wait, if you look at the clerk's records of court appearances, there were three, four, or more appearances where we would, Mr. Veloff representing Karen and myself representing Bob, appear before Judge Levy, and we could not get a hearing on the motion to modify it. I mean, obviously the reason I filed it is because by the time the judge was entered, as you noted earlier, the numbers were completely out of whack. But we couldn't get a hearing. So we get a contempt finding before we get a hearing on the substantial change. Correct. The case is reassigned to Judge Byers, and he sets it. And, I mean, to be perfectly frank, to me the numbers were so obvious, I was happy to have a hearing on the contempt because it would give us an opportunity to show how the numbers have changed. And, I mean, I was dumbfounded when Judge Byers found it in contempt. The other thing that's important to note, this is not a guy that was not paying any money. While he was going through this, he didn't own any real estate. He didn't have any bank accounts. The CDs he had had to be paid over to pay down the house that was awarded to Karen. He didn't even own a car. But he was paying $750 to $800 a month in child support, plus he was paying $375 a month because his daughter was in dance. He was paying $250 a month into a college account, and he was paying $600 or so for his daughter who was a student at Mizzou. I'm not sure about the Mizzou, but the top three were all things that he was required to do under the judgment. So this was not a guy that was saying, hey, I have a tough time, so I'm not going to pay anything. He was trying as best he could to hold up his end of it. It's a very similar case to the one that this Court had a number of years back, LaValle. Mr. LaValle was a stereo shop owner down in Carbondale. And this was apparently at the time that Best Buy was coming online and so forth, and the local stereo shop went under. And what this Court found in reversing the finding of contempt was people do have financial reversals. And, you know, again, the standard for contempt is willfulness. Do you have the money and are you willfully disregarding your obligations? And in that case, this Court found that Mr. LaValle showed sufficient proof that there had been a substantial change in the market and that his business had deteriorated, that he made other efforts to find gainful employment, and that he was, to the best he could, meeting his obligations. And I think that's the same situation you have here. I think the quantum of proof more than satisfies Logsdon. We didn't just come in and tell a story. We showed documentation from A to Z. And I think the manifest way of the evidence demonstrated that there was no willfulness on the part of Mr. Petrovsky. We have a couple of related issues that fall beyond that. In the order the judge entered, didn't give him any opportunity to purge himself of contempt. What we're supposed to do is I find you in contempt, and if you do A, B, and C, you know, I will allow you to purge yourself of the contempt. He issued an order saying go to jail immediately. Didn't give him an opportunity to try and come up with the money to make any payments. And the other issue that we raised is the- But he didn't go to jail because he did come up with the money, correct? Yes. But isn't that going to move? Well, again, I think it's important that we follow rules. I tell clients all the time, you know, if you don't do this, this is the consequence, and so forth. And, I mean, I've got a doctor with six kids that I'm trying to cite for contempt right now, but that judge is doing it according to what I understand the case law to be, and that is saying I'm going to put you in jail unless you do A, B, and C and give the person an opportunity to apply. Ultimately, Bob was fortunate. He had a friend that was willing to come in and post the money. So, yes, he did not go to jail. What about the order of June 4th? June 4th, 2010, it says that claims failed to make any effort to pay child support, sentence six months at that time. This was during the pendency of this trial that went on. I was not involved in it then, but I've looked at the record enough. This was a very contentious case. As Justice Gates noted, there were umpteen hearings, and at one point, I'm assuming he got aggravated. He didn't pay the support, and the judge threatened him, and he paid the support, which is the way contempt is supposed to work. So, and again, I don't think if he was guilty of contempt three times before, it has nothing to do with this one. I think they have to rise and fall on their own merits. The IRS lien seemed to happen during this 18-month pendency. Exactly. The court had it under advisement. Yeah. Didn't it also happen earlier, though? I thought there was a contention that there was a levy earlier. These people spent money like crazy. They traveled all the time. They bought things. They had a very lavish lifestyle. So, yes, there were issues. The Ridgeview money from five years before, I don't think they, I think they had problems with capital gains tax because they didn't pay, they didn't pay. So they had a lot of tax problems, but there were no levies, no seizures, nothing until this is for 18 months. Right. Thank you.  Mr. Black. Thank you, Your Honor. This time the court has jurisdiction. Specific rule for this. I was amazed. I was sitting back there hearing about how Bob Trotsky was pulling his weight about how the expenditures were documented from A to Z. I quoted in the, well, this court's got them both quoted in the other brief, so his answers to questions about where the money went. But, and that's very intriguing, although there was never any finding of dissipation. I mean, are we supposed to just kind of look at the tea leaves and surmise that? No, and the money, the $497,000 from the Ridgeview property went into the party's joint money market account. So she had access to it as well? She did, but there was a paper record of the expenditures, so you could see who did what. And it was him. And so his counsel took him through it. But, Justice Chambliss-Koenig, there's some time spent by the court in its order about monies that were going out, but she never finds in her order that there was dissipation. No, no, she didn't. There's not one finding in that order. No, it's not dissipated. So how is he to be credited with that? He still has it. Says who? You? No, says the circuit judge in her both parties' testimony. There's no finding of that either. Right. Oh, but there is. There is? Okay. We don't know where it was found. Are we supposed to deduce that that was her finding? No, no, no, not about that. Largely unaccounted for. That was her words. Repeatedly. Largely unaccounted for. And his testimony, which was summarized in that brief, I mean, he could not be nailed down at all. He didn't know where the money went. Oh, yes, this $10,000, well, this could have been that. This $20,000, well, maybe it was that. Well, probably this. Well, I'm not sure about that. That's his testimony. He couldn't be pinned down on where any of this money went, and yet it was clear that the withdrawals were his. So it's not dissipation. We're just to consider it as assets of the marriage. Yes. Still out there. Yes, which is the living as if he still has. Yes. I'm sorry. Don't mean to interrupt. No, okay. But he's living as if he still has it. But the money was withdrawn because you were able to talk about $10,000, $20,000. You know there were withdrawals. You just don't know where they went. Right. And his counsel put it on the stand to go through it so he could explain it to the court. And that's the probably, maybe, gee, I don't know. It could have been this. It could have been that. We quoted in our brief. Actually, in the other brief. Okay. Explain to me, though, how you get willful contempt when you've got an IRS coming in and we've got now liens and checks being garnished and... Well, the levy was $33,000 a year, if I remember correctly. We're talking about a man who's got country club memberships in two states, homes in three states. Currently has homes in three states? Yes. I thought he didn't have any real estate there. He doesn't own any real estate, but he lives in a $600,000 house in Edwardsville. Well, his girlfriend owns that. Well, she doesn't own it. He's pretty fortunate, then. She doesn't own it. Exactly. He's got this amazing magic wand. I need to live in a $600,000 house? Abracadabra. I need a condo in Florida? Abracadabra. I thought the condo was foreclosed on. The condo was foreclosed on, but... But? It was awarded to him, and the way this shakes out... It was foreclosed on. So his magic wand didn't work very well on that one. Well, but his girlfriend, a corporation, did over $200,000 on the Florida condo. A corporation did. It was revealed to Trump that that corporation was his girlfriend. The girlfriend that's making $85,000 a year. But she wasn't awarded the condo. No, she's not awarded it. Did she get it with the $200,000? Oh. No? The record doesn't say. I don't know. Well, how can you then say that he has a condo in Florida if you don't know? He does now. Oh, he does now? Yes. Okay. But does he own it, or somebody else owns it? Oh, he doesn't own it. Okay. See, that's the oldest trick in the book, to divorce for it. Well, it is one of the oldest tricks in the book, but you have to connect the dots, you know? You do have to. So here we've got a guy with country club memberships in two states, with homes in three states that, for some reason, he doesn't own, with vacations all over the place, vacations in Vegas, pays his lawyers $2,000 a month. Where's all this money coming from? It's just alakazam. But the darn magic wand won't work when child supports do. What's wrong with this thing? Maybe the girlfriend doesn't want to pay for the child support. Oh, but wait, but you get a deputy standing behind him with the client in the handcuffs, and all of a sudden, ah, wait, we've got this thing working again. Okay. And the money shows up. The bank man shows up. It's always something. He's got it figured out to where he's never going to owe anything again. He's never going to have to. Oh, you want to know what the arrears was that they agreed to, by the way, on the child support? Man, it's $73,000. So far. Has it been paid? Well, that's not on the record, Your Honor, but I am informed and believe that it has not been paid. Magic wand doesn't work there either. It doesn't seem to work on child support. It doesn't seem to work on anything. But it won him $5,000 within five days. June the 4th was the trial judgment, and it says he's getting $5,000 by June the 9th. So he gets six months in jail. 10-5 in this case. 10-5 in this case, Your Honor. Judge Byers wasn't buying it any more than Judge Levy was. He had access to the whole record. He said it. He said he reviewed the whole record. And he wasn't buying it any more than Judge Levy was. That's from the first judge, so. Judge Levy is the first judge. Judge Byers is the second judge. He wasn't buying it any more. How come this darn magic wand only works when you want it to? How come it never works when you've got to take care of your obligations? It just never seems to fire right from that. What's going on here? And then the money shows up. He was really impressed by the fact that he had two law firms working against him. And they were paid. And he was running $2,000 a month through his business. He was running his business expense. Oh, did I mention his income? His adjusted gross, 2007 to 2009, was over $600,000. His business had gross receipts in 2012 of over $243,000. Listen to some of these business expenses. I already talked about the lawyers. Everybody runs their business. Reduces his income, of course. Tickets to Cardinals games. Rams tickets. Sunset Hills. Nice country club. Remember there? Country club in Florida. He's paying $375 a month just for the memberships. Alakazam. He claims his girlfriend's supporting him. Well, she made $170 in 2011. She was getting her business off the ground. But she only made $85 in 2012, and they're renting. That's $600,000. Renting? Renting. Oh, I thought she owned it. No, the record doesn't say that. Okay, so he's living in a rental house. Yeah. But you keep saying he owns homes. No, I never did. I said he has homes in three states. I was careful to say that. You're parsing words. Well, actually, I think they are, Your Honor. I think they're making it very careful. So they can't say, well, we've got this, we've got that. That $73,000 shouldn't come out of anyone he owns. But if he doesn't own anything, where's it going to come from? I think he's the one that's being very careful, Your Honor. We made our case to the trial judge that he had all that money that he took, or most of it, and that he was lying about his incomes, lying about his assets. We made that case, and the circuit court, two different judges believed us. Didn't believe him. The circuit court, when he walked in and said, good morning, Your Honor, the judge thought, well, he's just had three chances to lie based on what I've been hearing from him. Better check the weather, better check what time it is, better see if the road's still open. Because that man was not telling the truth. And both of these— From the point he walked in and said, good morning? He had three chances to lie. You're saying from the history that— I'm saying that neither of these judges believed a word out of this man's mouth once these proceedings were over. Neither one of them believed a word out of his mouth. And you call that prejudice, if you want. But Judge Levy went on for 40 pages about why she didn't believe him. Judge Byers went on for, what, 12? About why he didn't believe him. And this is who the state gives authority to decide who's telling the truth. Thank you. Mr. Sager. Thank you. The judge could certainly believe or not believe Bob. But how about the exhibits? How about the tax returns? How about the IRS records? How about the evidence of the intercepts and so forth? I have to respond to this, houses in three states. He had a house in Madison County. It was awarded to Karen. At the time of the judgment, the condo that Karen and Bob had purchased in Florida was in foreclosure. It's since been foreclosed. And does she own it? There is no condo in Florida. Okay. Yeah, they tried at one point. The girlfriend or the girlfriend? No, the girlfriend is Sherry Roth, and she works for, I want to say, Allstate, some big insurance company. And she had a very stable position. She makes a lot of money. She also has a couple of kids from a prior marriage. She gets child support. And she didn't spend her money like Bob and Karen spent their money. So, yes, I mean, Bob at the time of trial was driving Sherry's old minivan because her company gave her a company car. There are no assets. I mean, Bob didn't get anything. He had no retirement. He had no real estate. He had no condo. And we have this condo at the Lake of the Ozarks that they tried to make a big deal of. We introduced in the hearing with Judge Byers evidence that this was a condo that his parents and brothers and sisters, as they commonly do, purchased it 30 years ago. And we documented all that. The judge didn't have to believe Bob. We gave him the evidence. We gave him the documents. You know, he was paying nothing. The evidence was he was paying over $2,000 a month in child support, extracurricular expenses, the rest of that. This was not a guy that was just blowing it off. Did he have some money to pay his attorneys? Sometimes. Sometimes he didn't. But clearly, I mean, he was still making $90,000, but that was down almost 50 percent. And then you take $33,000 out of that off the top by the IRS. It's just a tremendous difference. The evidence, I think what you had, which Mr. Blood was kind of getting to at the end, I think Judge Byers may have read Judge Levy's order that is quite aggressively worded. I think it's a polite way to put it. She hated it. And he read that. And maybe when he walked in the door and said good morning, Judge Byers hated it. But the problem is the judge had an obligation to look at the evidence and make a decision based upon the manifest weight of the evidence. All of the evidence demonstrated that Bob was in a tremendously difficult financial position, and the judge disregarded that. Thank you. Thank you. Okay. We'll take this case under advisement, and an opinion we'll issue hopefully soon.